**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RAYMOND SWETT, #220143,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-02087** |
| | ) | **Judge Aleta A. Trauger** |
| **KEVIN GENOVESE, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM**

Petitioner Raymond Swett, a prisoner in state custody, filed a timely *pro se* Petition (Doc. No. 1) under 28 U.S.C. § 2254 for the writ of habeas corpus, challenging his conviction in the Davidson County Criminal Court on charges of first-degree felony murder, especially aggravated kidnapping, and aggravated burglary. The respondent filed an Answer (Doc. No. 17) in opposition to the Petition, along with a copy of the underlying state-court record (Doc. No. 18). The matter is ripe for review, and this court has jurisdiction. 28 U.S.C. § 2241(d).

As an initial matter, because the issues presented can be resolved with reference to the state-court record, the court finds that an evidentiary hearing is not necessary. *See Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) (holding that if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing (citing *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998))).

Further, upon consideration of the record as a whole, the court finds, for the reasons set forth herein, that the petitioner is not entitled to relief on the basis of any of the grounds asserted. The Petition will therefore be denied and this matter, dismissed.

# I.    PROCEDURAL BACKGROUND

The petitioner and two co-defendants were originally indicted in a ten-count indictment charging aggravated burglary (Count 1), four counts of especially aggravated kidnapping (Counts 2–5), attempted first-degree murder (Count 6), especially aggravated robbery (Count 7), first-degree premeditated murder (Count 8), first-degree felony murder (Count 9), and possession of a controlled substance with intent to deliver or sell (Count 10). (Doc. No. 18-1, at 4–16.) One of the co-defendants agreed to testify; his trial was severed while the petitioner and his other co-defendant proceeded to trial. Just prior to trial, the state requested to amend the indictment and proceeded on eight renumbered charges: aggravated burglary (Count 1), especially aggravated kidnapping (Counts 2–5), aggravated robbery (Count 6), first-degree premeditated murder (Count 7), and first-degree felony murder (Count 8). (*Id.* at 59–68.) The petitioner pleaded not guilty to all charges. (*Id.* at 17.)

On October 8, 2010, a Davidson County jury found the petitioner guilty of aggravated burglary (Count 1), one count of especially aggravated kidnapping (Count 2), second-degree murder (lesser included offense of Count 7), and first-degree felony murder (Count 8). He was acquitted on the other charges. (*Id.* at 76–83.) The court merged the two murder convictions and sentenced the petitioner to life on that conviction, twenty-two years on the kidnapping conviction, to run consecutively to the life sentence, and six years on the burglary conviction, to run concurrently with the kidnapping sentence, for a total effective sentence of life plus twenty-two years. (*Id.* at 82.) Judgment was entered on November 12, 2010, and the petitioner filed a timely Motion for Judgment of Acquittal or a New Trial on December 2, 2010. (*Id.* at 84–85.) The trial court denied that motion by written Order on January 24, 2011. (*Id.* at 87–90.)

The Tennessee Court of Criminal Appeals affirmed the petitioner's convictions and

sentences on direct appeal. *State v. Swett* ("*Swett I*"), No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at \*1 (Tenn. Crim. App. Jan. 4, 2013), *perm. app. denied* (Tenn. May 9, 2013).

On July 22, 2013, the petitioner filed a *pro se* petition for post-conviction relief in the state trial court. (Doc. No. 18-24, at 50–74.) The court appointed counsel, who filed an Amended Petition. (*Id.* at 82–91.) After conducting a hearing at which the petitioner and his trial attorney testified, the trial court entered an order denying the petition. (Doc. No. 18-24, at 97–118.) That decision was affirmed. *Swett v. State* ("*Swett II*"), No. M2014-02243-CCA-R3-PC, 2015 WL 5679292 (Tenn. Crim. App. Sept. 28, 2015), *perm. app. denied* (Tenn. Jan. 14, 2016).

The petitioner filed his federal habeas Petition in this court around August 9, 2016.[1] After being directed by the court to respond, the respondent filed his Answer on November 14, 2016. (Doc. No. 17.)

## II.     FACTUAL SUMMARIES

The Tennessee Court of Criminal Appeals summarized the evidence presented at trial as follows:

> The facts of this case are largely undisputed. Following a drug deal gone awry, the defendant and Calvin Hargrove went to the apartment of Jessica Cain–Beaty, and, while there, the defendant struck Ms. Cain–Beaty repeatedly with a gun while demanding the return of money he believed was owed to him as a result of the drug transaction. After one of Ms. Cain–Beaty's friends gave him the money, the defendant left the apartment and walked toward the exit of the apartment complex. Just before the defendant reached the exit, Jeffrey Beaty, Ms. Cain–Beaty's estranged husband, confronted him. The defendant warned Mr. Beaty with the gun while walking backward toward the exit. When Mr. Beaty continued to advance, the defendant shot him.

> At trial, Ms. Cain–Beaty testified that early in the day on May 24, 2009, the defendant, whom she knew as Skeet, telephoned her to inquire about purchasing prescription pills from her, and she agreed to give him 10 pills that had a street

---

[1] The petitioner indicated on the signature page of the Petition that it was placed in the mail in "Aug. 2016," without providing a specific date. (Doc. No. 1, at 30.) It was received by this court on August 9, 2016. (*Id.* at 32.)

value of $20 and $20 cash in exchange for $40 worth of powder cocaine. After they struck the deal, the defendant arrived in the parking lot outside her apartment in a vehicle being driven by an individual she did not know. Ms. Cain–Beaty described what happened next:

I went to the window and I gave him the bottle of pills, the ten pills, and twenty dollars cash. And then I waited for what I thought I was supposed to get and he said he had already . . . given it to me. And I said this . . . isn't right. And I proceeded to grab the twenty off his lap and . . . I went back inside.

She said that instead of $40 worth of powder cocaine, the defendant had given her "just a little tiny crumb of something" that "there wasn't enough to do." She put the cocaine under her bathroom sink. She said that she talked to her friends, Major Drinks and Justin Harmer, "for about five minutes" and that she went into her apartment alone.

Ms. Cain–Beaty testified that approximately five to 10 minutes later, Mr. Drinks and Mr. Harmer returned to the apartment and told her that the defendant and the other man had returned. She said that she "got the door open enough to let" Mr. Harmer inside the apartment, but she was forced to leave Mr. Drinks outside; she shut the door and locked the three locks to prevent the defendant's entering. Ms. Cain–Beaty testified that when she told the defendant that she was going to telephone the police, the defendant said, "I don't care if you call the cops" and then kicked in the door. The defendant, who was armed with a handgun, grabbed Ms. Cain–Beaty by the hair and dragged her into the bathroom, where he hit her in the head with the gun a number of times and kicked her in the head and face "repeatedly." During the beating, the defendant demanded the return of "his twenty dollars." Ms. Cain–Beaty said that the defendant did not give her "any kind of chance to ever get" the money and that she did not have the money because she had originally borrowed it from Mr. Harmer and had returned it to him after the deal soured.

According to Ms. Cain–Beaty, her neighbor, Mikhol Preston, arrived at some point and gave the defendant $20 so that he would leave. She said that the defendant broke her nose with the gun and kicked her in the head before leaving through the broken door. "About thirty seconds after that then the door opened again, but it wasn't them, it was Jeff." Mr. Beaty asked what had happened and where her attacker had gone, and she told Mr. Beaty that "they had guns and they were crazy" and begged him not to go after the men. She said that Mr. Beaty ignored her pleas and left the apartment through the patio door. She eventually managed to gain her feet and walked toward the door of the apartment. Ms. Cain–Beaty testified that before she could get out of the apartment, she heard a single gunshot. She went outside and saw Mr. Beaty lying in the parking lot.

During cross-examination, Ms. Cain–Beaty admitted to heavy drug use around the time of the offenses but denied using drugs on that particular day. She also admitted smoking crack cocaine with the defendant on an earlier occasion but

denied having a sexual relationship with him. Ms. Cain–Beaty conceded that she lied to police about her association with the defendant during an initial interview but said that she later disclosed that the attack came on the heels of a botched drug deal.

Major Drinks testified that he was living with Ms. Cain–Beaty at the time of the offenses, but the two were not romantically involved. On May 24, 2009, the defendant called Ms. Cain–Beaty to inquire about purchasing some prescription pills. Mr. Drinks said that he was standing in the breezeway of the apartment building when the defendant arrived in a sport utility vehicle ("SUV") being driven by a person that Mr. Drinks did not recognize. He recalled seeing Ms. Cain–Beaty and Mr. Harmer approach the passenger side window of the SUV and hearing Ms. Cain–Beaty say, "Somebody's trying to beat me, he's trying to beat me." Mr. Drinks said that Ms. Cain–Beaty "snatched" some money from the defendant and walked back toward her apartment.

After observing the SUV exit the parking lot, Mr. Drinks walked with Mr. Harmer back to Ms. Cain–Beaty's apartment. Before they reached the apartment, they saw the SUV return. Mr. Drinks said that Mr. Harmer ran to Ms. Cain–Beaty's apartment and shut the door. The driver parked the SUV, and the defendant and another man got out of the SUV armed with guns. The men asked Mr. Drinks where Ms. Cain–Beaty had gone, and he told them that he did not know. The men then pounded on Ms. Cain–Beaty's door, demanded that she open it, and ordered her to return the money. The man with the defendant kicked the door in, and the defendant entered through the broken door. Mr. Drinks walked in behind him. Mr. Drinks said that once inside the apartment, the defendant grabbed Ms. Cain–Beaty and dragged her to the bathroom. Mr. Drinks testified that although he could not see into the bathroom area, he heard Ms. Cain–Beaty screaming and heard the defendant's companion say, "Why are you beating her like that?" Shortly thereafter, the man told the defendant that he was leaving and left the apartment via the sliding glass door.

Mr. Drinks said that he followed the man out of the apartment and saw the man get into the SUV and leave. He then went to look for Mr. Harmer, whom he had seen leave the apartment just before the defendant's companion. When he could not find Mr. Harmer, Mr. Drinks walked back toward Ms. Cain–Beaty's apartment. Mr. Drinks testified that as he neared her apartment, he saw Mr. Beaty go into Ms. Cain–Beaty's apartment. The defendant, he said, had already exited Ms. Cain–Beaty's apartment and was walking across the parking lot. Shortly thereafter, Mr. Beaty came out of the apartment and asked Mr. Drinks where the defendant had gone. Mr. Drinks said that he pointed the defendant out but warned Mr. Beaty that the defendant was armed. Mr. Drinks said that Mr. Beaty "seemed calm" and that Mr. Beaty claimed that "he wanted to speak with the gentleman in a calm manner." Mr. Drinks testified that he followed Mr. Beaty, who was walking at a "normal pace," from a short distance. Mr. Drinks said that as they approached the defendant, the defendant began to back away but told Mr. Beaty, "I got something for you." Mr. Drinks said that when Mr. Beaty was

approximately "two or three feet in front of" the defendant, the defendant raised his gun and shot Mr. Beaty. After the defendant shot Mr. Beaty, the SUV, which had returned just before the shooting, drove away, and the defendant ran away in the same direction.

During cross-examination, Mr. Drinks admitted that he had sold prescription pills for Ms. Cain–Beaty before and that he told police that Ms. Cain–Beaty had been "turning tricks with" the defendant the day before the offenses. Mr. Drinks said that despite the defendant's warning Mr. Beaty off, Mr. Beaty continued to approach him.

Mikhol Preston testified that at the time of the offenses, she lived in the apartment directly above Ms. Cain–Beaty's. On that day, she heard "a lot of noise coming from outside," so she looked out her window and saw Ms. Cain–Beaty getting out of a black SUV. Ms. Preston said that she returned to what she had been doing, but she went downstairs to investigate when she heard Ms. Cain–Beaty yell several times. She testified that as soon as she got downstairs, Ms. Cain–Beaty rushed her into Ms. Cain–Beaty's apartment and locked the door. The two women went into the bedroom, "and before [they] could even start speaking again, [they] heard a noise[,] and . . . two other gentlemen entered her apartment." Ms. Preston said that the men were armed and that the defendant shouted, "Where is my money, where is my money?" She testified that the defendant then took Ms. Cain–Beaty "by the arm and led her into the bathroom." Ms. Preston said that she heard "a loud smacking noise" followed by Ms. Cain–Beaty's screaming, "Stop, please stop hitting me." She recalled that the defendant's companion, whom she identified as Calvin Hargrove, shouted for the defendant to "come on," and when the defendant did not respond, the man left. Mr. Drinks and Mr. Harmer left the apartment behind Mr. Hargrove.

At that point, Ms. Preston testified, the defendant dragged Ms. Cain–Beaty back into the living area of the apartment. He hit her again and demanded the return of his money. Ms. Preston said that she asked the defendant how much money was owed to him, and he told her that Ms. Cain–Beaty owed him $20. Ms. Preston said that she got $20 from her own purse and gave it to the defendant. The defendant struck Ms. Cain–Beaty "a few more times and kicked her" before he left the apartment.

Ms. Preston testified that she got her purse and attempted to leave when Ms. Cain–Beaty asked her to record the license tag number of the SUV. Ms. Preston said that although she agreed, she "wasn't going to go out there and get the license plates" because she "was too scared." When she exited the apartment, she saw Mr. Beaty running toward Ms. Cain–Beaty's apartment. After Mr. Beaty went inside the apartment, Ms. Preston went to a neighbor's house and knocked on the door until someone let her inside.

Metropolitan Nashville ("Metro") Police Department Officer Ashley Kendall Coon responded to the call of a shooting at the Pagoda Apartment Complex at

approximately 11:00 p.m. on May 24, 2009. When Officer Coon arrived at the complex, he observed Mr. Beaty's body lying "roughly thirty feet" from the front of the apartment complex. Ms. Cain–Beaty was near the body, and "she appeared to be cut up, looked to have been beat on." He said that "she was basically just in a basic state of hysteria" and that, as a result, he was unable to get any information from her. He called an ambulance and tried to obtain information from other witnesses at the scene.

Metro Officer Carroll Fondaw testified that he assisted in setting up the crime scene and that he requested and reviewed surveillance video recorded from the Walmart located across the street from the Pagoda Apartments. He said that video cameras recorded a dark SUV pull into the Pagoda apartments at 10:53 p.m. The same vehicle exited the apartment complex at 11:00 p.m. and returned at 11:08 p.m. The vehicle again exited the complex at 11:12 p.m. and returned at 11:14 p.m. The video then showed an individual running out of the apartment complex toward the Walmart approximately 30 seconds later. The SUV "followed, stopped briefly and then that subject got into that vehicle and then it appear [e]d as though that dark colored SUV continued east on Welch."

Jennifer Grubbs, an investigator with the medical examiner's office, testified that she responded to the Pagoda Apartments and pronounced Mr. Beaty dead at 2:20 a.m. She recalled that Mr. Beaty had "a black single drop blade knife" in his "right rear pocket" at the time he died. Ms. Grubbs removed the knife, along with Mr. Beaty's other personal possessions, and photographed them at the scene.

Shameka Saffold, custodian of records for Cricket Communications, testified that cellular telephone records showed that several calls were placed from a cellular telephone registered in the defendant's name to a cellular telephone registered in Ms. Cain–Beaty's name on May 24, 2009, in the hours leading up to the offenses. The last call was placed at 11:05 p.m. A call was placed to 9-1-1 from Ms. Cain–Beaty's cellular telephone at 11:10 p.m.

[Co-defendant] Maxwell Alexander Delancy testified that on May 24, 2009, he was at Mr. Hargrove's house "conversating, hanging out" when the defendant arrived and spoke to Mr. Hargrove "about some sort of drug deal he had for Hargrove." Mr. Delancy heard the defendant tell Mr. Hargrove that the defendant had "a lady down there who has $20 and will give you $20 worth of some type of pills for $40 of crack." Mr. Delancy said that Mr. Hargrove asked him to drive the defendant to make the transaction and that he agreed because he owed Mr. Hargrove money. Mr. Delancy testified that the defendant directed him to the Pagoda Apartments and that when he pulled into a parking space, "[t]he white lady that [he] had seen came to the car, just directly to the car." He described what happened next:

And they're conversating and she shows him—she gives him $20 already. And she gives him $20, he has the crack in his hand. As he's about to show her the crack, . . . she's opening up a pill bottle as well while he's about to open up . . .

his hand. He's opening up his hand; she sees it. And she looks at it for a second; pauses and looks at it. And then she goes on . . . . No, no. You're not . . . about to get me. You're not about to get me. No. No. No. Just carrying on and pretty much just takes everything out of Swett's hand including her pills, including that $20 and the crack, and walks off.

After Ms. Cain–Beaty walked away, Mr. Delancy "threw [the] car in reverse and started driving." He said that he told the defendant that the defendant would be responsible for telling Mr. Hargrove what had happened. Mr. Delancy testified that the defendant said that he "didn't give a f* * * that he got stolen from and he don't give a f* * * about what Hargrove thinks."

Mr. Delancy said that he drove directly to Mr. Hargrove's residence. Once there, the defendant went inside first and told Mr. Hargrove what happened. Mr. Delancy recalled that Mr. Hargrove came to Mr. Delancy and told him that the defendant wanted Mr. Hargrove to provide him with drugs for setting up the deal with Ms. Cain–Beaty even though the deal went sour. Mr. Hargrove then asked Mr. Delancy to return him to the apartments to get his money back. Mr. Delancy said that he did not want to do so, and the two argued. At that point, Mr. Hargrove called in the debt that Mr. Delancy owed. Mr. Delancy testified that because he did not have the money to repay the debt, he agreed to take Mr. Hargrove and the defendant back to the Pagoda Apartments.

Mr. Delancy said that during the drive to the apartments, the defendant was "in the back pissed off that Jessica even got over on him on this situation. And he's throwing himself everywhere around the car, and making a big scene in the car. Yeah, man; screaming, you know, I'm going to f* * * this b* * * * up. She doesn't know me. She doesn't know who I am." Mr. Delancy testified that Mr. Hargrove told the defendant to "calm the f* * * down, chill the f* * * out, you're not going to do anything, just calm down." When they arrived at the apartments, Mr. Hargrove told the defendant to call Ms. Cain–Beaty, but the defendant was unable to do so, so the two men got out of the car and walked to the apartment. Mr. Delancy testified that "seven to ten minutes" passed before he saw someone come out of the sliding glass door and travel "straight up to another path of stairs." He then saw Mr. Hargrove stick his head out the sliding glass door, glance both ways, and then go back inside for "like 5, 10 seconds" before returning to Mr. Delancy's vehicle. When Mr. Hargrove got inside the vehicle, he told Mr. Delancy that the defendant was in the apartment "beating her." Mr. Delancy said that he told Mr. Hargrove to "go get him, he's going to kill somebody; go get his a* *." Mr. Hargrove instead ordered Mr. Delancy to leave.

Mr. Delancy testified that he complied with the order and drove away. When they reached "the top of Welch Road," Mr. Hargrove "pull[ed] out a gun and thr[e]w it underneath the seat." At that point, Mr. Hargrove told Mr. Delancy to turn around and go back to the apartment to get the defendant because "he's going to kill somebody." Mr. Delancy said that when they pulled into the parking lot, he saw "two individuals on down inside the apartments along where the cars are parked

and one other individual and Swett. The one individual is walking up on Swett, walking towards Swett. Swett keeps backing up; walking up on him." Mr. Delancy said that he pulled "right next to both of them," and Mr. Hargrove told the defendant to "quit f* * *ing around, get in the car." The defendant backed away and the other individual kept walking toward him. Mr. Delancy rolled the car forward to the point where both individuals were behind it. At that point, the defendant shot the other individual.

Mr. Delancy testified that when he pulled out of the apartment complex, he "almost hit" the defendant, so he "slow[ed] down from snagging [the defendant] and [the defendant] opened [the] car door and gets in the car." The three returned to Mr. Hargrove's house, and Mr. Hargrove removed the gun from Mr. Delancy's car. Mr. Delancy said that he spoke briefly with Mr. Hargrove's mother and then left.

Mr. Delancy recalled that at some later date, Mr. Hargrove called Mr. Delancy and said, "[Y]ou need to come over to my house and you need to get this story together so what I said to the detectives and what you're going to say to the detectives hopefully coincides together and doesn't make it look like he was leaving anything out of his story." According to Mr. Delancy, Mr. Hargrove also told Mr. Delancy to tell police that they did not pick the defendant up after the shooting.

During cross-examination, Mr. Delancy admitted that he lied to police in his first two statements and only changed his story one month before the defendant's case was scheduled to go to trial. Mr. Delancy described the defendant as "a crack head" whom he had never seen with a gun before.

Associate medical examiner Adele Lewis, who did not perform the autopsy of Mr. Beaty, reported the conclusions of her colleague. According to Doctor Lewis, Mr. Beaty suffered a single "gunshot wound on the left side of the upper part of the chest" that "struck the major blood vessel ... from the heart to the rest of the body that's called the aorta. Then it hit the heart itself. Then it injured the major blood vessel that carries blood in the body to the lungs called the pulmonary trunk." The bullet "injured both lobes of the left lung; caused a bruise of the right lung. Again injured the major blood vessel that carries blood to the rest of the body lower down in its course" before it "exited partially through the . . . back." She testified that the wound would have caused death "within a matter of minutes." Based upon the absence of tattooing or soot on Mr. Beaty's clothing or skin, she determined that the fatal shot was fired from greater than three feet.

The State rested, and co-defendant Calvin Hargrove testified on his own behalf. Mr. Hargrove, who was 18 years old at the time of the offenses, testified that the defendant was a friend of his mother's and that he had known Mr. Delancy since they attended school together. He said that on May 24, 2009, the defendant came to him seeking $20 worth of cocaine. Mr. Hargrove stated that he gave the cocaine to the defendant, and the defendant paid him for the drugs. He denied any

knowledge that the defendant and Mr. Delancy were going to meet with Ms. Cain–Beaty for a drug deal. He testified that Mr. Delancy arrived at his house at approximately 10:45 p.m., and the three men left ten minutes later to travel to Mr. Hargrove's girlfriend's house. Mr. Hargrove said that he was surprised when Mr. Delancy traveled to the Pagoda Apartments.

Mr. Hargove testified that when they arrived at the Pagoda apartments, the defendant went to Ms. Cain–Beaty's apartment. He said that he did not see the defendant in possession of a gun. Mr. Hargrove insisted that he stayed in the vehicle with Mr. Delancy until he "heard screaming and hollering." At that point, he said, he went to investigate and saw the defendant inside the apartment "beating" Ms. Cain–Beaty. He said that he told the defendant to stop and then left. Mr. Hargrove admitted that he had a gun in his pocket and that he placed his hand in his pocket, but he could not be sure whether others saw the gun.

Mr. Hargrove testified that when he returned to the SUV, he told Mr. Delancy to leave. Soon after they left, Mr. Delancy expressed a desire to go back to the apartment complex to "see what was going on." When they pulled into the parking lot, Mr. Hargrove saw the defendant walking and "three other people coming toward him." Mr. Hargrove described what happened next: "And that's when Skeet had turned around and they kept approaching him. Then the other two guys, they kind of stayed back. And the other guy kept coming closer." He said that the defendant started "kind of walking backwards." The two men were yelling at one another. Mr. Hargrove testified that he did not see the actual shooting because the men moved behind the SUV.

The defendant testified that at the time of the offenses, he did not have a job and was "strung out because [he] was getting drunk and high every day." He stated that he first met Ms. Cain–Beaty approximately one week before the offenses and that he told her that he "would trade some dope for sex" and that she agreed. He said that they both used drugs, had sex, and exchanged phone numbers before he left. "[A] couple of days" later, he called her, and the two used drugs together again but did not have sex. On May 24, 2009, the defendant saw Ms. Cain–Beaty as he was walking through the apartment complex, and she asked if he would trade her cocaine for her pills. The defendant said that when he told her he didn't think that would work, she offered to sell the pills for cash. The defendant testified that he told Ms. Cain–Beaty that he was not interested in buying them, but he would try to find a buyer for her. Eventually, Ms. Cain–Beaty told him that she did not want to sell her pills but wanted to trade them for crack. He said that they finally agreed that Ms. Cain–Beaty would give the defendant 10–12 pills plus $20 cash in exchange for $40 worth of crack cocaine. The defendant said that he "got ahold of some people for her and set the deal up" and then traveled to the apartment complex with Mr. Delancy. The defendant said that he was to get "a little bump" of cocaine for his personal use as payment for his setting up the transaction.

According to the defendant, when they arrived at the apartment complex, he

showed Ms. Cain–Beaty the cocaine, and she gave him the money and the pills. At that point, she said, "[O]h, no, man, f* * * that" and "[s]natched everything out of [his] hand." The defendant testified that Mr. Delancy told him that they needed to "tell [Mr. Hargrove] what the f* * * went down," so they returned to Mr. Hargrove's house. After some conversation, the three men decided to return to Ms. Cain–Beaty's apartment to "discuss it." The defendant said that he believed that Ms. Cain–Beaty probably wanted him to give her more cocaine.

The defendant testified that when they arrived at Ms. Cain–Beaty's apartment, Mr. Hargrove refused to let the defendant go into the apartment alone, and Mr. Delancy encouraged the defendant to go armed and provided the gun. The defendant said that he held the gun in his hand rather than putting it in his pocket because he was "not really familiar with guns." He knocked on the door, but no one answered. The defendant said that he stepped over to the sliding glass door of the apartment but "[b]efore [he] got around the bushes, the door was kicked in." He claimed that he did not intend to frighten Ms. Cain–Beaty. The defendant denied kicking in the door but admitted that he entered the apartment through the fallen door and walked directly to Ms. Cain–Beaty. He said that he demanded the return of his money, and Ms. Cain–Beaty, who "had a little thing tied around her arm," "looked like she was surprised." He said that when he demanded the return of his money a second time, Ms. Cain–Beaty feigned surprise and told him to "get the f* * * out of here." The defendant acknowledged that at that point, he struck her with the gun, and she fell to the floor with her head in the bathroom. He denied that Ms. Cain–Beaty had her cellular telephone in her hand during the encounter. Instead, he said, she had a syringe in one hand. He said that he again demanded the money and admitted that he struck Ms. Cain–Beaty again after "she gave the ol' glare, you know, just get the f* * * out of my face."

The defendant testified that he believed that he struck Ms. Cain–Beaty "four or five times" and that he stopped hitting her when he "raised up and . . . seen all that blood." When he turned around, Ms. Preston gave him $20, and he left. He said that he did not ask Ms. Preston for money. Nevertheless, he "put it in [his] pocket and walked out the front door." When he got outside, he saw that Mr. Delancy was gone. He said that he walked away "not running but . . . trying to get out of there."

According to the defendant, as he walked across the parking lot, he heard someone say "hey, mother f* * * * * " like they knew him, but he did not turn around. When he heard it a second time, he "turned around and looked and it was this dude running up on" him. He said that he told the man to back off, but the man kept "coming with his hand behind his back." When the man got closer, he said, "Yeah, n* * * * *, I got your a* * now. I'm going to kill you. I got you." The defendant said that he kept backing away in an attempt to reach the street so that he could run away. The defendant testified that he was frightened and believed the man intended to kill him. At that point, the defendant raised his gun and fired a single shot. He insisted that he did not aim the gun at Mr. Beaty. The defendant said that after firing the shot, he "took off running" and got into the SUV driven

by Mr. Delancy as it pulled into the apartment complex.

The defendant insisted that he did not know he had killed Mr. Beaty. He admitted that he never saw Mr. Beaty in possession of a weapon but maintained that he believed, based upon Mr. Beaty's carriage and demeanor, that he was armed.

During cross-examination, the defendant testified that he made it almost to the apartment complex entrance before being confronted by Mr. Beaty. He claimed he could barely recall his interview with the police on the day after the shooting and that he could not recall in any detail what he said. He admitted that he had lied because he was "drunk and high" and that he did not tell police that he shot Mr. Beaty in self-defense.

*Swett I*, 2013 WL 53993, at *1–9 (footnote omitted; alterations in original).

The state appellate court summarized the evidence presented at the post-conviction

evidentiary hearing as follows:

The petitioner testified that, before trial, counsel never discussed the State's witness list with him, how those witnesses would possibly testify, what the State's proof against him would be, or what their theory of defense would be. The petitioner told counsel his version of the events the first time he met her. However, counsel never talked with him about how he was going to present his version of events to the jury or whether he was going to testify and what that would entail. It was only during the trial, after the State's witnesses had testified, that he told counsel he needed to testify to tell his side of the story, and they discussed his testifying while sitting side by side in the courtroom.

The petitioner testified that he asked counsel whether she had been in contact with any potential witnesses who were at the apartment complex at the time of the shooting and saw a man come up to him. He said that counsel told him that she was trying to locate some people and "just be calm, just be cool." However, the petitioner admitted that he did not give counsel any specific names of people to contact, explaining, "I was just wanting her to talk to anybody that was in that vicinity. I didn't have no specific names . . . it's people that hangs out in the apartments."

The petitioner testified that counsel never explained to him that he would be subject to cross-examination if he testified. Counsel also did not prepare him for what hers or the State's questions might be. As a result, he was caught off guard and unprepared for many of the questions asked of him. The petitioner also testified that, at one point, counsel referenced a "motor vehicle burglary," which perplexed him because he was charged with aggravated burglary and there was no mention of a motor vehicle in the indictment or facts. He stated that counsel never discussed any pretrial motions that they could file. He felt that counsel was generally unprepared to handle his case. He elaborated that she mentioned during

the trial that the indictment had some type of error in it, but he maintained that counsel should have prepared to defend him "instead of going in trying to . . . use an indictment issue as being wrong."

The petitioner testified that counsel was also ineffective in the handling of his appeal. He said that counsel had to supplement the record twice in order to appeal one of his issues. However, she promised the court a supplemental brief addressing that issue but never filed one, which the court noted in its opinion. As a result, one of his issues was not reviewed.

Trial counsel testified that, after she was retained to represent the petitioner, she went to see him and they discussed the case and plea offer from the State, possible defenses, and a possible counter-offer. Counsel thought that there might be self-defense issues in the case and that the State might agree to a counter-offer of fifteen years. She discussed the potential for a counter-offer with the petitioner, but "he didn't want the fifteen." Counsel said that she discussed the petitioner's charges with him, his range of punishment on each charge, and his exposure if found guilty. She said that she "went over everything with him. . . . I don't know what . . . I could have left out."

Counsel testified that she had a copy of the discovery, and she talked to the petitioner about what the State's proof might be at a trial. She discussed who the State's witnesses might be with the petitioner, and she interviewed witnesses. She recalled talking on the phone to Major Drinks, who had observed the apartment door being kicked in. She also personally interviewed a woman, possibly named "Mindy," who lived in the apartment complex.

Counsel testified that she could not recall the exact number of times she visited the petitioner in the jail, but she thought that twelve times sounded accurate. She remembered that the visits were "thorough visits." Counsel recalled that the petitioner's position throughout was that he acted in self-defense and that was their only defense at trial.

Counsel stated that she discussed the petitioner's testifying with him and recalled telling him, "[I]f you testify as a self-defense you're going to have to make it clear." However, counsel said that she regretted not discussing "courtroom etiquette [with the petitioner] a little bit more," elaborating that she was "shocked at some of the language" the petitioner used on the stand.

Counsel testified that she recalled arguing that the petitioner's actions with regard to the first part of the incident did not constitute kidnapping. She did not recall if she "argued hard much on the aggravated burglary . . . [and] may have even conceded as much." However, counsel maintained that she argued any facts that were in dispute. Counsel explained that her legal strategy was that she thought she could get a judgment of acquittal on the felony murder charge because the indictment indicated that the underlying felony was burglary, which she believed

the State did not prove.

Counsel testified that, with regard to the appeal, she filed for an extension of time because she did not have the entire record. She filed a brief but asked the court of criminal appeals "to allow [her] time to file a supplemental brief pursuant to the supplemental record being filed." However, she decided not to file a supplemental brief because she "had covered all [her] issues basically in the initial brief that [she] needed to. And having received the supplement[al] briefs there was no new issue that needed to be raised." She said that she "just asked for permission in case [she] did need to [file one]."

Counsel testified she "vigorously" argued in her closing argument that the incident which occurred in the apartment was separate and distinct from the self-defense shooting outside near the exit of the apartment complex as a way to show that the State failed to prove felony murder. Counsel noted that she won an acquittal for the petitioner on three counts of especially aggravated kidnapping and on the charge of the attempted first degree murder of Ms. Cain–Beaty. Based on her experience, she did not think the State could prove a premeditated murder, and the jury found that it did not given it convicted the petitioner of the lesser-included offense of second degree murder.

*Swett II*, 2015 WL 5679292, at *8–9 (alterations in original).

### III. ISSUES PRESENTED FOR REVIEW

The petitioner raises six claims of ineffective assistance of counsel, as follows:

Ground one: trial counsel failed to "correctly inform the Petitioner regarding the potential punishment he could receive if found guilty." (Doc. No. 1, at 6.)

Ground two: trial counsel failed to "review or discuss the evidence the State had against Mr. Swett nor did trial counsel discuss trial strategy in preparation for trial." (*Id.* at 9.)

Ground three: trial counsel "didn't discuss the trial strategy or defense theory with petitioner even though self defense was the cornerstone of the theory. (*Id.* at 11.)

Ground four: trial counsel failed to "prepare the defendant for his own testimony at trial." (*Id.* at 13.)

Ground five: trial counsel "didn't properly prepare herself for trial." (*Id.* at 14.)

Ground six: trial counsel failed to file a motion to sever offenses. (*Id.* at 17.)

In addition, in Ground seven, the petitioner argues that the cumulative effect of all of counsel's errors violated his constitutional rights.

## IV.    STANDARD OF REVIEW

### A.    Exhaustion and Procedural Default

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal district court may not entertain a petition for the writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine designed to promote comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a ' fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available,[2] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal

---

[2] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). Moreover, if a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose v. Lundy*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under AEDPA).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted (because it was not presented to a state court for review), and it may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims would result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 311 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

### B.    Fully Exhausted Claims

Even when a petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 raises claims that have been properly exhausted in the state courts, this court's review of the state court's resolution of those issues is "highly deferential." *Davis v. Ayala*, 135 S. Ct. 2187, 2198

(2015), *reh'g denied*, 136 S. Ct. 14 (2015). This court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, a claim asserting only a violation of state law, even if fully exhausted, is not cognizable in federal habeas corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Further, under § 2254(d), the federal court cannot grant a habeas petition with respect to a fully exhausted federal claim unless the state court's adjudication of that claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

When considering whether a state court's decision was based on an unreasonable factual determination, this court must presume the correctness of state-court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Indeed, "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Id.* at 102–03 (citation and internal quotation omitted).

With these principles in mind, the court will turn to the examination of the claims raised in Mr. Swett's petition for habeas relief.

V.     DISCUSSION

A.     Procedurally Defaulted Claims

Grounds six and seven—that trial counsel failed to file a motion to sever offenses and that the cumulative effect of all of counsel's errors violated the petitioner's constitutional rights—were not fully exhausted in the state court proceedings. Although both of these claims were articulated in the petitioner's Amended Petition for post-conviction relief (Doc. No. 18-24, at 88), they were not presented in the petitioner's appellate brief to the Tennessee Court of Appeals (*see* Doc. No. 18-25) or, consequently, addressed by that court. *See Swett II*, 2015 WL 5679292, at *9 (listing claims raised in the appeal).

As set forth above, to completely exhaust a claim, the petitioner must fairly present that claim to every available level of the state court system. *Rose*, 455 U.S. at 518–20. The petitioner's failure to raise these claims in his post-conviction appeal means that he did not fairly raise them at every available level of the state system. Moreover, state procedural rules, specifically the one-petition rule, Tenn. Code Ann. § 40-30-102(c), and the one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a), bar the petitioner from raising the claims in the state courts now. As a result, the claims are deemed to be exhausted (because no avenue for raising the claims in state appellate court remains) but procedurally defaulted for the purposes of federal habeas review.

To obtain consideration of a claim that is procedurally defaulted, as previously discussed, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). In this case, the petitioner does not assert cause for the procedural default or acknowledge that the claims are procedurally defaulted. Instead, he asserts that he raised both of

these issues in his post-conviction appeal. (Doc. No. 1, at 18, 20.) The court finds that these claims are barred from review as procedurally defaulted.

The court also notes that Ground Seven, that the cumulative effect of counsel's errors resulted in a violation of the petitioner's constitutional rights, is not cognizable on federal review. *See Bacon v. Klee*, No. 15-2491, 2016 WL 7009108, at *5 (6th Cir. Nov. 30, 2016) ("The Supreme Court 'has not held that distinct constitutional claims can be cumulated to grant habeas relief.'" (quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002))). Thus, to grant relief on this claim would constitute the use of federal habeas corpus to announce a new rule of constitutional law, a result prohibited by the text of AEDPA itself. *See* 28 U.S.C. § 2254(d)(1) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."). For this reason too, the petitioner is not entitled to relief based upon cumulative error.

**B.      Exhausted Claims**

Grounds one through five, all asserting claims of ineffective assistance of counsel, were fully exhausted in the petitioner's state post-conviction proceedings.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that, in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment, a criminal defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

As discussed above, however, a petitioner may be entitled to relief in a federal habeas

proceeding only if he shows that the state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2). That is, when a properly exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is *not* whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101.

The Tennessee Court of Appeals articulated the appropriate *Strickland* standard of review governing the petitioner's ineffective assistance claims. *Swett II*, 2015 WL 5679292, at *10. It then addressed the claims as follows:

> Again, the petitioner asserts that counsel rendered ineffective assistance at trial in that she . . . did not discuss the material in the State's response to discovery, did not explain the possible punishment or exposure he faced on his charges, did not discuss a strategy of defense or possible witness testimony, did not prepare him to testify at trial, and was unprepared for trial. Counsel testified she discussed the case . . . with the petitioner, as well as possible defenses, the charges against him, the range of punishment on each charge, and the petitioner's exposure if found guilty. Counsel testified that she had a copy of the discovery, and she talked to the petitioner about what the State's proof might be at a trial. She discussed who the State's witnesses might be with the petitioner, and she interviewed witnesses. Counsel recalled that the petitioner's position throughout was that he acted in self-defense and that was their only defense at trial. Counsel said that she discussed the petitioner's testifying with him even though she regretted not discussing "courtroom etiquette [with the petitioner] a little bit more," elaborating that she was "shocked at some of the language" the petitioner used on the stand. The post-conviction court accredited counsel's testimony as to these issues. Accordingly, the petitioner has failed to prove that counsel performed deficiently in these regards.

*Id.* at *10.

The only question before this court is whether the state court's application of *Strickland* was reasonable, *Harrington*, 562 U.S. at 101 and, in particular, because the appellate decision

was based on the post-conviction court's credibility determination, whether the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(2).

In that regard, the court finds that the state courts' decision to credit trial counsel's testimony is supported by the record, insofar as counsel indeed testified that she discussed the charges and potential punishments with the petitioner (ground one), discussed discovery and the evidence against him (ground two), explained that the trial strategy involved self-defense (ground three), and indicated that she was not completely unprepared for trial (ground five). (*See* Post-Conviction Hr'g Tr., Doc. No. 18-25, at 61–64.) The petitioner has not established that the state appellate court's adjudication of these claims involved an unreasonable determination of the facts or was contrary to federal law as established by *Strickland*.

The facts regarding whether trial counsel actually prepared the petitioner to testify at trial require closer consideration. The petitioner testified that counsel never discussed with him whether he would testify prior to trial. His argument now appears to be that it should have been obvious that, in order to prove self-defense, the petitioner would have to testify, as counsel herself appeared to acknowledge. (*See* Doc. No. 18-25, at 85 ("Right. I knew he . . . may have to testify, yes.").) However, counsel did not clearly testify that she actually worked with the petitioner on what his testimony would be or that she explained that he would be subject to cross-examination. When asked, "Prior to the trial did you discuss with him his right to testify or not testify?" counsel responded:

> A. I didn't read anything like you have, I mean, but I told him – we talked like I talk to anybody, that if you testify as a self-defense you're going to have to make it clear. I talked with him about testifying and that he would have – I'll tell you this that I regretted on his case, that I thought he was at a certain mental level. I thought – I don't know, I probably should have listened to him talk more because I remember that day in court when he testified I was shocked at some of the

language he was using. . . . [S]o I did think maybe I could have talked to him [about] courtroom etiquette a little bit more and maybe I could have done that. But it's always been self-defense.

(*Id.* at 65–66.)

On cross-examination, counsel was asked directly if she actually walked her client through his anticipated testimony in order to prepare him to testify. Although she ostensibly answered "yes," the remainder of her testimony qualified that response and indicated that, in fact, her discussions with her client prior to trial were very general and that she wanted but was denied the opportunity to discuss his testimony more particularly with him during trial, immediately before he testified:

Q. Okay. . . . Do you recall before trial having a sit-down with [your client] about his testimony and what he would say and how he would say it, and that kind of thing? Basically prepping him for testifying in his trial?

A. Yes. I don't know how close to trial that was, but we definitely talked about self-defense, what occurred, what happened. I do remember at trial prior to him testifying and I wanted to make sure – I went over – well, I know we were forced to sit in the courtroom with everybody there while I discussed further, you know, you're about to testify and – I wasn't allowed to leave and talk to him by myself just prior to him taking the stand. . . . So I was essentially letting the Court know I haven't been allowed to speak – I'm not saying ever been able to speak to him but just like –

A. Just prior to actually him having to do it you didn't get a chance to talk to him about it?

A. I didn't really get to go over with him – I noted that. And even I think when we came back for the motion for judgment of acquittal or whatever I noted that the judge had allowed the codefendant, who was on bond, you know, to meet with his lawyer prior to testifying and speak with him, the same courtesy that was not extended to us.

Q. And you didn't have – you didn't think you were extended enough privacy under those circumstances?

A. Right. Especially considering our conversations and communications would be limited. I explained that. . . .

Q. But it wasn't a shocker that he was going to – you kind of expected going

in as part of the trial that he would testify. Given that it was a self-defense nature, you figured he probably would?

A.     Right. I knew he – I knew he may have to testify, yes.

Q.     And so that had been discussed previously?

A.     Right, right.

Q.     What you're saying is you didn't get an opportunity to finalize it just before he actually made the decision in the circumstances that you wanted to finalize it?

A.     Right. Well, yeah. . . . It's just I wasn't able to, you know, just speak with him. And, you know, in every other case I've been able to do that almost, any other case. If I need to speak with a defendant on bond or not on bond, whatever, the Court has always allowed me to speak with my client prior, immediately prior, to my client testifying. And even though the Court allowed that we were to remain in the courtroom and talk.

(*Id.* at 83–86.)

In other words, counsel stated that she talked to her client about testifying and about self-defense, but she never actually stated that she worked with him on his testimony or went over the questions she would ask and the kinds of questions that would be asked on cross-examination. Based on her confusing and equivocal testimony, the court finds that the state court's determination that trial counsel adequately prepared her client to testify at trial "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(2).

This bare finding, however, does not mean that the petitioner is entitled to relief. Under *Strickland*, a petitioner asserting ineffective assistance of counsel must show both that counsel was constitutionally ineffective and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Here, the petitioner never presented any evidence establishing that counsel had an affirmative obligation to go over each potential question with her client and help him practice testifying, as the petitioner suggests she should have done. It is therefore not clear

that counsel was constitutionally ineffective. Moreover, the petitioner has not remotely indicated how he was prejudiced by his counsel's failure to prepare him more thoroughly for testifying. He has not shown, for example, that he was in possession of additional favorable evidence that did not come to light because counsel failed to prepare him. Nor has he shown that his failure to anticipate being questioned on cross-examination thwarted his defense. Ostensibly, he knew he was obligated to tell the truth under oath; that truth should not have varied substantially, whether he was prepared or unprepared for the questions he was asked on the stand. The record reflects that he testified that he was frightened when the murder victim approached him and that he believed the man intended to kill him, which would have been sufficient to establish self-defense. The jury obviously did not credit his testimony, but there is no basis in the record for finding that counsel should have coached him to be more believable. The court therefore finds that the petitioner is not entitled to relief on the basis of this claim either.

In short, the petitioner has not established that he is entitled to relief on the basis of any of his claims of ineffective assistance of counsel.

## VI.    CONCLUSION

For the reasons set forth herein, the court will deny relief.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b). Under this standard, the court finds that the petitioner has not made a substantial showing of the denial of a constitutional right and will therefore deny a COA.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge